UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

vs.                                             Case No. 3:25-cr-00072-SFR

CANYON BEASLEY                                  October 29, 2025

## CANYON BEASLEY'S SENTENCING MEMORANDUM

At age 19, Canyon Beasley began an online relationship with a girl ("MV") whom he met on the social media platform TikTok. She told him she was 17, and he believed her. Depressed and socially isolated at college, Canyon was already spending most of his free time in his single dorm room on his iPhone, watching YouTube videos, TikTok, and pornography. He paired his online activity with drugs and alcohol. Once he began his relationship with MV, he spent most of his time talking to her, primarily through Snapchat text messages and FaceTime calls. The relationship became increasingly sexual; the two exchanged photographs, videos, and sexually explicit messages, some of which were sexually violent. Seven months into the relationship, MV told Canyon her real age. She was 13. Despite his dismay upon learning her age, Canyon continued the relationship. In June 2024, he flew from Oregon to Connecticut to meet MV in person. They had sex, which Canyon filmed on his phone. Canyon was 21; MV was 14. Doc. #1-1 (Criminal Complaint Affidavit) at 4. Canyon was subsequently charged in both state and federal court for his actions.

Canyon's arrest stunned and devastated his family. His loved ones knew Canyon to be a compassionate, helpful, shy, respectful, and considerate person; his actions seemed completely incongruous with the person they knew. Since his arrest, Canyon has accepted responsibility for his offense, expressed sincere remorse, engaged in multiple forms of treatment, held employment, rebuilt trust with his family, and maintained sobriety. He has fully complied with the strict conditions of his

pretrial release, which include home detention, electronic monitoring, and no internet access whatsoever. He will be severely punished for his conduct. He also recognizes that severe punishment is warranted for what he did. Exhibit A (Canyon Beasley Letter to Court) at 6. He has already agreed to a ten-year sentence in state court, and he faces staggering potential penalties in this federal case. He respectfully requests that this Court impose a sentence that is sufficient but not greater than necessary to serve the purposes of sentencing, consistent with the parsimony clause of 18 U.S.C. § 3553.

I.    **HISTORY AND CHARACTERISTICS**

   **A. Canyon was born into a loving family.**

   Canyon Beasley was born in April 2003 in Portland, Oregon. He was the first child of Ernie and Maria Beasley. Four years before Canyon was born, Ernie graduated from a five-year plumbing apprenticeship. Over the next several years, Ernie saved up money by working as a plumber and renovating houses in the Portland metro area. By 2003, he was a principal plumber with hopes of starting his own business. Maria was born and raised in Monterrey, Mexico. She and Ernie met in 2001. They immediately wanted to spend their lives together and shared aspirations to raise a family. They married later that year. Maria planned to be a full-time mother and homemaker and was grateful for the opportunity to live the American Dream.

   Before Canyon was born, Ernie and Maria "lost a child who had been determined to have Down Syndrome." Exhibit W (Healthcare Record Excerpts) at 8. After that devastating loss, they were overjoyed with Canyon's arrival. Their joy was repeated when they welcomed another son, Logan, two years later.  They all settled into family life in Beaverton, a suburb outside of Portland.

Canyon and Logan became the lights of their parents' lives. They enjoyed raising their sons within the close-knit network of both paternal and maternal relatives as well as neighbors and family friends.

 

### B. Canyon exhibited developmental delays as a young child.

Soon after Logan was born, Ernie and Maria started to notice differences between their sons. Logan was a more active, vocal baby than Canyon had been. As a three-year-old, Canyon was still quiet, and he struggled to speak clearly. Worried, Maria took him to their pediatrician. Maria initially wondered whether Canyon might have some form of autism. Eventually, Canyon was diagnosed with an articulation disorder and, later, significant language deficits. Exhibit W at 1, 3-4. Canyon's treatment records reflect that he had difficulty responding to questions, following simple directions, and making consistent eye contact. *Id.* at 2, 7-8. When he was given toys, his play was "not as complex and varied as would be expected" for a three-year-old. *Id.* at 3.

Canyon received two years of speech therapy and early intervention services. Even after finishing treatment, he remained introverted and slow to make friends in a way that Maria worried about. Exhibit D (Maria Beasley Letter to Court) at 1, 2.

3

Still, Canyon had a built-in best friend – his younger brother. Canyon and Logan spent a lot of time outside: riding bikes, playing baseball and soccer, climbing the tree in their front yard, "adventure camp" with other kids in the summers. When it was hot, they raced home from the school bus to press their faces up to the AC. They loved video games. Maria took them to the pool, to the zoo, and to feed the ducks.

 

Canyon spent his elementary years at Barnes Elementary School in Beaverton, where he struggled with impulsiveness and poor attention. His second-grade teacher wrote that Canyon needed to improve his ability to have self-control. In fifth grade, he received an R for "rarely" in communication and working with groups, and his P.E. teacher gave him a 1-2 out of 5 for social skills.

**C. Canyon enjoyed video games and computers, but struggled socially.**

In 2013, when Canyon was ten, his parents bought him a computer for Christmas. He already loved playing video games with Logan. Exhibit E (Logan Beasley Letter to Court) at 1. They always made time to play Wii, Nintendo, and DS games together. After he got his own computer, Canyon created a YouTube account and started posting videos he made about video games. Like many young people his age, he was just beginning to be exposed to online media and experiencing the dopamine

rush that accompanies views, likes, and comments on his videos.[1] These feelings generate cravings for further digital validation and have led many young people to find the internet more rewarding than real-life interactions.[2]

When Canyon was twelve, his family moved from Beaverton to Gresham, Oregon. Ernie's business in Beaverton had failed, and the family wanted a fresh start. Exhibit C (Ernie Beasley Letter to Court) at 2. The two suburbs – on opposite sides of Portland – are less than an hour apart. Still, for Canyon, moving meant switching schools halfway through seventh grade, and living with his paternal grandmother in Gresham while Ernie finished renovating a comfortable and spacious suburban home in the nearby Sunstone Ridge subdivision.

Canyon had close, loving relationships with extended family and family friends, as described in the twenty-one letters of support attached to this memorandum. But he struggled to form peer friendships. Exhibit D at 2. Throughout his youth, Canyon felt awkward and immature compared to his peers. Other kids often made it clear that they found him "annoying." Despite his teachers' admonitions, he couldn't keep himself from blurting things out in class. It wasn't much quieter inside his head. He couldn't stop counting things over, or repeating song lyrics endlessly to himself. Exhibit W at 12, 22. His academic and behavioral challenges frustrated his father, who often lashed out verbally at Canyon. *See* PSR ¶ 45. What Canyon perceived as his father's disappointment in him chipped away at Canyon's self-esteem. *See* PSR ¶ 62.

---

[1] De D, El Jamal M, Aydemir E, Khera A., *Social Media Algorithms and Teen Addiction: Neurophysiological Impact and Ethical Considerations*, Cureus, 2025 Jan 8;17(1), *available at* https://www.cureus.com/articles/304975-social-media-algorithms-and-teen-addiction-neurophysiological-impact-and-ethical-considerations#!/.

[2] Amirthalingam J, Khera A., *Understanding Social Media Addiction: A Deep Dive*, Cureus, 2024 Oct 27;16(10), *available at* https://www.cureus.com/articles/303374-understanding-social-media-addiction-a-deep-dive#!/.

**D.  In middle school, Canyon began experimenting with drugs and alcohol.**

In the summer of 2016, Canyon figured out how to feel less awkward – or at least, how to care less about feeling awkward. Ernie had been prescribed Oxycodone after multiple surgeries, and during the family's move into the Gresham home, where they reside today, Canyon found the old pill bottles. The drugs soothed his racing thoughts, and he took them regularly until the medication ran out. *See* PSR ¶ 54.

Canyon struggled socially at his new school. Dexter McCarty Middle School was a small school; there were only 150 kids in his grade, and most of them had known each other since kindergarten. Canyon felt isolated and left out. He experienced the social uncertainty and pressure to fit in that came with being the new student at school. *See* PSR ¶ 62.

For eighth grade, he moved to the local public school near his new home, Deep Creek-Damascus K-8, where he faced the same challenges as at Dexter McCarty. Moving to a third school in just three years, Canyon envied the other students who had longtime friend groups. Still, he had his brother Logan, and their new next-door neighbor, Brayden. The three boys became fast friends and always made sure to be there for each other. Exhibit F (Brayden Hoberg Letter to Court) at 1. They rode their bikes together, spent weekends outdoors at Brayden's family cabin, played video games, and discussed the challenges they were facing as teenagers. *Id.* at 2.

When Canyon was fifteen, he and Brayden started drinking, on the sly, out of Ernie's liquor cabinet in the basement on weekends. They also smoked a lot of marijuana, which had been legal in Oregon since Canyon was eleven. He bought vapes online with gift cards that he got for holidays. Maria and Ernie didn't know about Canyon's increasing substance use, but they could tell he was struggling. In ninth grade, Canyon attended Sam Barlow High School, where he earned a C- average.

6

Even when he tried to focus in class, he was distracted: counting his breaths, tearing his cuticles, chewing on his shirt collars, and counting how many times he blinked. Exhibit W at 22.

Hoping for a fresh start, Canyon transferred to a private school for tenth grade, Damascus Christian, making this his fifth school in five years. Yet again, he faced the trials of adapting to a new social environment. Concerned about the challenges he was experiencing, Maria took him to the pediatrician, who diagnosed him with inattentive-type ADHD, and noted "some OCD tendencies." Exhibit W at 23. Canyon was prescribed ADHD medication, but he stopped taking it after a week because of the side effects.

Tenth grade was a more stable time for Canyon. His grades weren't great, but they were better. He had a girlfriend, Felicity, who was a classmate one year older than him. PSR ¶ 50; Exhibit C (Ernie

 

Beasley Letter to Court) at 3. They dated for a year, and Canyon lost his virginity. Their relationship ended when Felicity left for college. PSR ¶ 50. Canyon spent the summer working at McDonald's (pictured above), and his parents helped him buy a car with his earnings. He was starting to take on more age-appropriate responsibilities.

7

Canyon returned to the public high school, Sam Barlow, for his junior year. The COVID-19 pandemic broke out in the spring semester of his junior year, in March 2020. Canyon was sequestered at home, taking his classes virtually, and he began to feel depressed. Detached from his peers and deprived of social interaction, he began spending most of his waking hours on his iPhone. His screen time skyrocketed. He watched YouTube videos and spent hours on social media. His pornography use, which had been daily since age 15, significantly increased. PSR ¶ 64.

Canyon finished high school virtually through the public-school system's Web Academy program. After working briefly for his father Ernie's plumbing business to see if he might want to pursue a trade, he decided to go to college instead. His heart wasn't in it, but Ernie had issued an ultimatum for his sons that if they didn't enter a trade or go to college within a year of high school graduation, they would have to move out of their family home and support themselves independently. Exhibit C at 3.

**E. In college, Canyon's substance use, internet use, and social isolation increased.**

In fall 2021, Canyon began attending Warner Pacific University in southeast Portland, about a 30-minute drive from home. He moved into the dorms and was assigned a single room. During the first month of college, Canyon wanted to make friends, but he worried that he was perceived as loud and awkward. *See* PSR ¶ 62. Due to his insecurities, he kept mostly to himself: working part-time, lifting weights at the gym, or alone in his dorm room. He didn't have a roommate, so there was no one to notice or judge his increasingly heavy drinking. He bought alcohol from a 7-11 near campus that didn't check his ID. He also started drinking codeine, a prescription narcotic. He spent most of his free time online, watching pornography, TikTok, and YouTube videos, including those of misogynistic social media influencers like Andrew Tate. At first, Canyon visited home a few times a month; as college went on, he spent less time with his family. This was the peak of his social isolation.

8

## II.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

### A.  At age 19, Canyon began an online relationship with MV.

In January 2023, Canyon was starting the second semester of his sophomore year of college. He had received straight C's in the fall, except in PE. He was also sniffing cocaine regularly. He thought he would major in business, but he didn't have any real idea of what he wanted to do with the degree. Outside of his employment at Best Buy, he spent most of his time in his dorm room on his phone, often spending 14 hours or more online per day. Exhibit A at 3.

That month, he saw a lip sync video that the minor victim ("MV") had posted on TikTok. He thought that she was pretty and cool, and it was easier to message her than try to approach anyone in person at college. Canyon and MV began messaging, and MV told Canyon she was 17 years old and lived in Connecticut. In fact, she was 12 years old at the time. But she seemed and looked mature, and Canyon had no reason to suspect she wasn't telling the truth about her age. Within a few weeks, Canyon and MV were talking constantly, and they started "dating" without ever meeting in person.

For the first seven months of their fully virtual relationship, Canyon believed MV was 17. The relationship was tumultuous. Like Canyon, MV struggled with substance use and mental health issues. They repeatedly fought, broke up, and reconciled – without ever meeting in person. They were in constant contact at all hours of the day and night, mostly by texting on Snapchat. During those initial seven months, the online relationship became sexual. That spring, Canyon failed two classes.

### B.  Canyon and MV's relationship became increasingly sexual and toxic.

In July 2023, Canyon began requesting sexually explicit images and videos of MV. She sent him photos and videos that, given her age, constituted child pornography. Canyon also sent explicit photographs of himself to MV. In her forensic interview following Canyon's arrest, MV stated that she "thought it was a pretty normal thing to send nudes to your boyfriend or girlfriend."

9

MV revealed her real age to Canyon in August 2023. She was 13 years old. Canyon was shocked and upset. As MV described it in her forensic interview, Canyon "freaked out." MV begged him to stay with her and threatened to message his family members to reveal their relationship if he ended things. In what Canyon now understands was a horrific failure in judgment, he did not leave the relationship. Nor did he try to seek help. Exhibit A at 3. He feared returning to the loneliness he experienced before he met MV and internalized that he had already committed himself to a relationship that he now understood was illegal.

Over the next year, Canyon's behavior spiraled further. His conversations with MV became even more sexual and violent and frequently focused on her age. He wrote things to her that he never spoken aloud in real life, repeating phrases and themes that emulated pornography he had watched. His alcohol and drug use continued to increase. Exhibit A at 5 ("The worse my language and behavior in the relationship got, the more I lost control with my addiction.") His grades continued to decline. In the fall, he withdrew from one class and got a D- in another. In April 2024, he was arrested for stealing a laptop from the Best Buy store where he worked part-time. He pled guilty to a misdemeanor theft of property charge. By that time, he was using 3 to 4 grams of cocaine a week. That semester, he only passed one class. Without telling his parents, he withdrew from college. He moved home at the end of the spring semester

### C.  Canyon traveled to Connecticut to meet MV in person.

In June 2024, about a year and a half into the relationship, Canyon made another terrible, life-altering choice: he flew to Connecticut to meet MV in person, a plan they had been discussing for months. He told Ernie and Maria that he was going to Connecticut with a friend from the gym. MV stated in her forensic interview recalled that she felt "unsure" about the visit as the date approached, because she had another boyfriend by that time. Still, she "wanted to do it for the plot."

10

Canyon had been texting intermittently with MV's mother, Amy, who knew about his age and his relationship with MV.[3] At first, MV told Canyon he could stay at her house, but after Amy changed her mind, Canyon rented an Airbnb in Middlefield, CT. From June 12 to 21, 2024, Canyon spent time with MV in Connecticut. MV snuck out of her house to see him, and Canyon picked her up in a rental car, from her neighborhood and even from her middle school. MV stated in her forensic interview that when she saw Canyon in person, "he was really awkward" and "weird," and looked different than he looked in photographs and videos. At the Airbnb, Canyon and MV listened to music, watched movies, drank alcohol, used marijuana, and had sex. Canyon filmed their sexual contact on his phone and later sent the video to MV.

**D.  Canyon was arrested and experienced his first-ever period of incarceration.**

During the week that Canyon was in Connecticut, MV's father Aaron, found out about their relationship. According to a police report, Aaron went to the local police department on June 17, 2024 to report that MV was "possibly being exploited by two adult men, one of whom lives out of state." The police launched an investigation and notified the FBI. On June 20, MV told Canyon that her father had notified the FBI, and Canyon messaged her, "Please don't let him do this." Doc. #1-1 at 14-15.

Over the next few months, after Canyon returned to Oregon, the FBI investigated Canyon. They searched MV's phone and obtained Canyon's TikTok and Snapchat records. They also interviewed MV, her parents, and her friends. On September 23, 2024, a criminal complaint was filed

---

[3] Notes from the FBI's interview of MV's mother Amy confirm that Amy knew about the relationship and texted with Canyon beginning in spring 2024. According to the notes, Amy stated that she "felt that Canyon was actually help[ing] [MV] and that breaking off the relationship would devastate [MV's] mental health."

against Canyon in federal court. He was arrested at home in Oregon on September 26, 2024. He had his initial appearance in the District of Oregon and was ordered detained, pending his transport to the District of Connecticut.

Canyon arrived at Wyatt Detention Center in Rhode Island on or about October 30, 2024. He had his initial appearance in the District of Connecticut on November 1, 2024. Defense counsel requested that the Court schedule a bond hearing for November 13, 2024, to allow time for Canyon's parents to arrange their travel from Oregon, and to allow time for Probation to sufficiently investigate the proposed bond package. At the time, Canyon felt ambivalent about whether to pursue release on bond; he wondered whether he "belonged in prison and nowhere else," given the gravity of what he had done. Exhibit A at 5. As he heard his conduct discussed aloud in Court, and as he saw the messages that he had sent to MV in black-and-white in the complaint affidavit, the shame he felt was all-consuming.

On November 13, 2024, Canyon's motion for release on bond was granted, under strict conditions of release, including home detention, location monitoring, and no access to the internet. Upon his release from federal custody, he was immediately arrested by the state for the same conduct. His parents posted bail in state court, and Canyon returned home with them to Oregon to begin the painful and difficult process of facing what he had done.

## III.    PRETRIAL SUPERVISION AND TREATMENT

Canyon's arrest forced him to confront a two-year period of incredibly shameful behavior. For the first time in years, he had no choice but to be honest: about his drug use, his academic failures, his deceit of his parents, and most importantly, the harm he did to MV. His family members were shocked, devastated, and heartbroken to learn about Canyon's offense. Ernie and Maria continue to grieve their son's actions and the harm that he caused. They also continue to love their son

unconditionally and support Canyon's rehabilitation. Exhibit D at 2. With his family's help, Canyon has been able to reckon with his behavior and slowly rebuild his life.

### A. Canyon has maintained employment throughout his release on bond.

Within two weeks of returning home, Canyon completed community service for his Oregon misdemeanor theft charge. Soon after, he began working in the warehouse of Caliber Mechanical, his father's plumbing and HVAC company. For the past year, he has worked there about 30 hours a week, logging and organizing plumbing and HVAC inventory. *See* Exhibit G (Joe Riley Letter to Court) at 1.

### B. Canyon engaged in much-needed mental health and substance use treatment for the first time in his life.

In December 2024, Canyon began treatment, both at Volunteers of America (VOA) and with Dr. Jane Ward at the Oregon Center for Change (OCC) in Portland. At VOA, he engaged in intensive outpatient substance abuse treatment, alongside individual therapy, before advancing to a lower level of care. His counselors noted that he participated and listened attentively when others were speaking about their experiences. He has since been successfully discharged from the relapse prevention program and continues to get mental health care. Canyon's doctor at VOA prescribed Wellbutrin and Trazodone for his depression; both medications are also commonly used as off-label treatment for ADHD. He has taken Propranolol during periods of elevated anxiety. This is the first time Canyon has been consistently medicated for depression and anxiety, and he has responded well to the medications.

During sessions at VOA, Canyon initially discussed his doubts about whether counseling would work for him, but he also expressed a willingness to make positive changes to his life. He has tried out new practices such as journaling and reading a page of the Bible every week. He has become

more introspective and admitted that most of his problems stemmed from his difficulties processing emotions, which led to drug and alcohol abuse. Through counseling, Canyon has confronted the anxiety he has faced because of his legal case and the damage it has done to his relationship with his family. He has expressed a desire to repair those relationships, especially with his mother.

**C. Canyon participated in sex offender treatment and testing.**

In early December 2024, Canyon started therapy with Dr. Jane Ward at the Oregon Center for Change, on a referral from his U.S. Probation Officer in Oregon. The referral included psychological and sexual offender risk assessment testing, which Dr. Ward administered to Canyon on January 22, 2025. Importantly, even at the outset of Canyon's sex offense-specific treatment at OCC, testing results showed that Canyon did not have deviant sexual preferences, did not identify emotionally with children, and did not harbor hostility toward women. Exhibit B (OCC Treatment Progress Report) at 1. "Deviant sexual preference" includes attraction to children. Canyon is not sexually attracted to children. His attraction to MV is not diagnostic of a deviant sexual preference, because MV had already developed secondary sexual characteristics and presented as a post-pubescent teenager; indeed, her assertion that she was 17 years old was not inconsistent with her physical presentation and language. Nor did Canyon's treatment providers (who specialize in working with sex offenders) identify in Canyon any other indicators of attraction to children or other deviant sexual preferences. Exhibit B at 1.

OCC Clinical Director Diana Groener notes in her summary of Canyon's positive treatment progress that, initially, significant concerns for Canyon included his capacity for relationship stability, impulsivity, sex preoccupation, and using sex as a coping tool. Exhibit B at 1. Counselor Groener observed that by October 2025, after ten months of treatment, Canyon had improved such that his

14

preoccupation with sex and use of sex as a coping tool were no longer concerns. She also found that his predilection towards impulsivity was reduced. *Id.* at 2.

Canyon's remarkable response to mental health and substance abuse treatment over the last year is further reflected in his complete compliance with the strict terms of his pretrial release. He spends his time working, participating in treatment, attending Mass with his mother, and socializing with his family at home. He has never tested positive for drugs or alcohol. Indeed, he has maintained his sobriety since his arrest in late September 2024. He has also abstained completely from the internet as required, which meant a drastic change from his pre-arrest lifestyle.

### D. Canyon pled guilty in state and federal court and has accepted responsibility for the harm he caused.

On April 25, 2025, Canyon appeared before this Court and pled guilty to one count of receipt of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2) and (b)(1). On April 29, 2025, Canyon appeared in state court in Middletown and pled guilty to second-degree sexual assault and illegal sexual contact, in violation of Connecticut state law. PSR ¶ 36. In state court, he agreed to a sentence of ten years of imprisonment, to be imposed concurrent to his future federal sentence. *Id.* He fully accepts responsibility for his actions and the harm he caused, as demonstrated not only by his guilty pleas but also by his sincere and introspective letter to the Court. *See* Exhibit A.

## IV.    LEGAL ARGUMENT

Canyon's offense was extremely serious, and he will be seriously punished. He faces staggering penalties. He is subject to a mandatory minimum sentence of five years, and a Guidelines range at or near the twenty-year statutory maximum. He faces a term of supervised release of at least five years, and up to life. His federal sentence will supplement the ten-year prison sentence to which he has already agreed in Connecticut state court for his sexual contact with MV. And as a registered

sex offender and convicted felon, Canyon will continue to be punished for his offense through far-reaching consequences, restrictions, and stigma long after his official sentence ends.

In this case, a prison sentence anywhere near the Guidelines range would be far greater than necessary to achieve the purposes of sentencing. In fashioning a sentence consistent with the parsimony clause, the defense requests that the Court consider Canyon's age, his substance use and mental health issues, the principle of incremental punishment, and the purposes of punishment under 18 U.S.C. § 3553. The Court should impose a sentence that does not exceed the ten-year state sentence that will run concurrent to Canyon's federal sentence.

### A. The governing legal standard requires the Court to impose the sentence that is minimally sufficient to accomplish the purposes of a criminal sentence.

In determining an appropriate sentence, the sentencing court must apply the "parsimony clause" set forth in 18 U.S.C. § 3553(a), which provides that courts "shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. Those purposes reflect the need for the sentence that is imposed:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)    to afford adequate deterrence to criminal conduct;
> (C)    to protect the public from further crimes of the defendant; and
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2). The Second Circuit explained in *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. *See id*. at 142 (stating that where a Guidelines' sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence).

In determining what sentence will best achieve the purposes of sentencing in each case, the sentencing court must consider the following factors:

1. The nature and circumstances of the offense and the history and characteristics of the defendant;
2. The kinds of sentences available and the applicable sentence under the Sentencing Guidelines;
3. Pertinent policy statements issued by the Sentencing Commission;
4. The need to avoid unwarranted sentence disparities among similar defendants guilty of similar conduct; and
5. The need to provide restitution to any victims.

U.S.C. § 3553(a)(1), (a)(3)–(a)(7).

**B. The Court must not presume the Guidelines to be reasonable.**

The PSR calculated an advisory Guidelines range that exceeds the statutory maximum in this case, making the Guidelines 240 months. In the plea agreement, the defense reserved the right to object to the adjustment for obstruction of justice pursuant to U.S.S.G. § 3C1.1. Having had an opportunity to review and consider the information in the PSR that serves as the basis for that enhancement, the defense has decided not to pursue that objection.

While the Court is required to consider the range of penalties suggested by the Sentencing Guidelines in determining the appropriate sentence in each case, the Court is not bound by that range. *See United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, the Supreme Court has repeatedly reminded sentencing courts that "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009); *see also Rita v. United States*, 551 U.S. 338, 351 (2007) (emphasizing that the only "presumption of reasonableness" that applies to a Guidelines sentence is "an appellate court presumption," not applicable in the initial sentencing analysis conducted by the District Court). Thus, while the Court must consider the recommendations of the advisory Guidelines, the Court may not presume that those

recommendations are reasonable. Instead, the Court must treat the recommended Guidelines range as only one among numerous factors in sentencing.

Sentencing courts are free to disagree with the Guidelines' recommended sentence in any case, and may impose a different sentence based on a contrary view of what is appropriate under § 3553(a). This includes the freedom to disagree with "policy decisions" of Congress or the Sentencing Commission that are contained in the Guidelines. *See Pepper v. United States*, 562 U.S. 476, 516 (2011) ("[O]ur post-*Booker* decisions make clear that a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views . . . . That is particularly true where, as here, the Commission's views rest on wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted.").

### C. Canyon's mental health and substance use issues, untreated at the time of his offense, weigh in favor of a downward variance.

At the time of his offense conduct, Canyon was socially isolated at college, suffering from untreated depression and anxiety. He self-medicated with drugs and alcohol, which impeded his decision-making, disinhibited his behavior, and exacerbated his mental health issues. He spent up to 14 hours a day on his iPhone, scrolling TikTok, consuming toxic and harmful ideas from social media influencers, and watching pornography. This was the context in which he began his relationship with MV.

Canyon's mental health and substance use issues, as well as his addictive behavior related to the internet and pornography, do not excuse his conduct. To the contrary, Canyon recognizes that he was "raised to know that what I was doing was completely wrong and that I should have been the responsible adult who put an end to it." Exhibit A at 2. Nevertheless, his substance use and mental health issues provide important context for his actions. Now, after more than a year of substance use

18

treatment, mental health treatment and psychiatric medications, and sex offense-specific therapy, Canyon is sober, clear-headed, and healthy. With the help of treatment and sobriety, he has developed remarkable insight about himself and about the harm he caused. Canyon's mental health and addictions at the time of the offense are part of his history and characteristics, as well as the circumstances of the offense, and are therefore relevant under § 3553.

> **D.  Canyon's age at the time of his offense weighs in favor of a downward departure or variance.**

Canyon's offense conduct began when he was 19 years old and concluded at age 21. Canyon's young age makes him an outlier in federal court and justifies a downward departure under § 5H1.1, or in the alternative, a variance under the § 3553(a) factors. In assessing Canyon's culpability and determining the appropriate sentence, the Court should consider the scientific evidence establishing that late adolescent brains are not fully developed, and that as a result, late adolescents are more likely to act impulsively and make poor decisions than adults. They are also more capable of change than adults.

The Sentencing Commission recently adopted amendments to the Guidelines policy statement on the departure for age, to recognize that courts should consider "the defendant's youthfulness at the time of the offense," "*into the mid-20's*." The newly-revised § 5H1.1 provides, in relevant part:

> Age may be relevant in determining whether a departure is warranted.
>
> …
>
> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into

19

> young adulthood. Youthful individuals also are more amenable to rehabilitation.
>
> The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.

U.S.S.G. § 5H1.1.

The Sentencing Commission's decision to amend the Guidelines reflects decades of federal court decisions affirming that "youth matters in sentencing." *Jones v. Mississippi*, 593 U.S. ----, 141 S. Ct. 1307, 1314 (2021). It is well-established that youth is inextricably linked to an individual's blameworthiness—or lack thereof—in committing a criminal offense. *See Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988) ("The basis for this conclusion is too obvious to require extended explanation."). In explaining why youth are less blameworthy than mature adults when engaging in criminal behavior, the Supreme Court has long identified "three general differences" between youth and mature adults. *Roper v. Simmons*, 543 U.S. 551, 569 (2005). First, scientific and sociological studies confirm that youth more often have a "lack of maturity and an underdeveloped sense of responsibility" in contrast to adults, resulting in "impetuous and ill-considered actions and decisions." *Ibid.* (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)). Second, youth are "more vulnerable or susceptible to negative influences and outside pressures," and they have "less control, or less experience with control, over their own environment." *Ibid.* Third, a youth's personality traits are "more transitory, less fixed" than those of an adult. *Id.* at 570 ("[T]he character of a juvenile is not as well formed as that of an adult."). Put together, a young person's "objective immaturity," "vulnerability," and "lack of true depravity" make "youth" a relevant, mitigating factor for a court to consider at sentencing. *Id.* at 570–73.

20

By contending that his age is a relevant mitigating factor, Canyon does not attempt to shirk responsibility for his offense. He recognizes that although he was young, MV was much younger. And as he recognizes in his letter to the Court, MV was more vulnerable than he was, not only because of her young age, but also because of factors related to her background and family. Exhibit A at 2. Canyon stands by his statements in his letter to the Court that he "should have been the responsible adult who put an end to" to the relationship, and that he had been raised to know right from wrong. Exhibit A at 2.

Nevertheless, his age (between 19 and 21 at the time of his offense) is relevant and mitigating, because scientific evidence, case law, and the Sentencing Guidelines suggest that Canyon's age provides context for his extremely poor decision-making, impulsive actions, and immature worldview, including his "underdeveloped sense of responsibility," at the time of his offense conduct. Scientific evidence, case law, and the Sentencing Guidelines also suggest that these traits and behaviors are not fixed. After his ten-year state sentence, Canyon will be an adult entering his thirties. He will have changed and matured significantly by then. Indeed, Canyon has already matured and changed markedly since his offense and will continue to do so over the next several years, which weighs against the imposition of an extremely lengthy sentence. His success in treatment, his full compliance with his strict conditions of pretrial release, and the insights he shared in his presentence interview and his letter to the Court are all evidence of his growing maturity. Accordingly, the Court should depart or vary downward based in part on Canyon's youthfulness at the time of his offense.

### E. The principle of incremental punishment weighs in favor of a non-Guidelines sentence.

The concept of incremental punishment suggests that a sentence anywhere near the Guidelines range in this case would be far greater than necessary to serve the purposes of punishment. This case

is Canyon's first felony offense. His only other contact with the criminal justice system was for shoplifting a laptop from his workplace, for which he pled to a misdemeanor and completed bench probation and community service. Prior to his federal arrest in this case, he had never been incarcerated.

In *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001), the Second Circuit stated the following:

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses[.]

Although the *Mishoe* court's inquiry was prompted by the Career Offender Guidelines, the court's reasoning applies in this case. Canyon is about to serve at least ten years, given the state sentence. There is no reason to believe that a longer sentence would be more effective than a ten-year sentence, because there is no point of comparison or historical example to disprove the efficacy of the lower sentence. *See, e.g.*, *United States v. Bun*, 3:13cr174(SRU), Judgment (ECF No. #72) (citing *Mishoe* and stating that "[t]he sentence imposed represents an incremental increase that should be sufficient to serve the purposes of sentencing"); *United States v. Keels*, 3:15cr17(JCH) (imposing below-Guidelines sentence based in part on the concept of incrementally proportionate sentencing philosophy).

### F.  The purposes of sentencing under § 3553(a) weigh in favor of a prison term that does not exceed ten years, followed by five years of supervised release.

Pursuant to § 3553(a), the Court must impose a sentence that is "sufficient, but not greater than necessary" to achieve the following purposes of sentencing: (1) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) specific and general deterrence;

22

(3) public safety; and (4) rehabilitation. In the plea agreement, the defense agreed "not to seek a term of imprisonment of less than 120 months." Doc. #44 at 7. For the reasons explained below, the Court should impose a sentence that does not exceed the ten-year state sentence that will run concurrent to Canyon's federal sentence, *i.e.*, a sentence that does not exceed 120 months. The Court should also impose a five-year term of supervised release, with conditions tailored towards Canyon's rehabilitation and the other purposes of supervised release. Such a sentence would be sufficient, but not greater than necessary to achieve the goals of sentencing.

> 1. *The proposed sentence will reflect the seriousness of the offense, promote respect for the law, and provide just punishment.*

Canyon acknowledges that his offense was extremely serious. For a young man convicted of his first felony, a decade in prison followed by five years of supervised release is a severe sentence that adequately reflects the seriousness of his offense and achieves just punishment. Canyon's period of incarceration may be especially punitive because of the nature of his offense, in that Canyon will be part of a vulnerable population in the Bureau of Prisons and could be targeted for violence by other inmates. Indeed, the Warden of MDC Brooklyn has testified that sex offenders can be placed in a category with cooperators and law enforcement officers as inmates "especially subjected to harassment and physical violence." *Defreitas v. Lindsay*, 2008 WL 4850195 at 3 (E.D.N.Y. Nov. 6, 2008).

In addition to the sentence imposed by the Court, Canyon will also be subject to the many collateral consequences of his first felony convictions, having now pled guilty to felonies in both state and federal court. When determining a "just punishment" under 18 U.S.C. § 3553(a)(2)(A), a sentencing court should consider the collateral consequences of a conviction. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a

23

'just punishment' if it does not consider the collateral effects of a particular sentence."). Individuals with criminal records "face potentially thousands of collateral consequences upon reentering society."[4] Canyon's conviction will follow him for the remainder of his life, and he will be subject to many of these collateral consequences.

The strict conditions of supervised release, to which Canyon will be subject for at least five years following his release from prison, will further punish him. On supervised release, Canyon will need to comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901 *et seq.*), as well as the sex offender registration requirements in the state where he lives (likely Oregon). He will likely be subject to periodic polygraph testing at the discretion of the Probation Office. He may be prohibited from contact with minors and prohibited from being in locations where minors are likely to gather. He will likely be subject to repeated financial disclosures, and subject to searches by the Probation Office of his person, residence, vehicle, and media devices. His internet use will be monitored by the Probation Office, and he will be required to subject his electronic devices to unannounced reviews.

In addition to the collateral consequences of a felony conviction and the conditions of supervised release, Canyon will experience the collateral consequences of a sex offense conviction specifically. He will be federally required to register as a sex offender under SORNA for at least 15 years; if he lives in Oregon, state law will require him to register as a sex offender for between 20 years and life. His sex offender status (which will most likely outlast his term of supervised release)

---

[4] U.S. Commission on Civil Rights, *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* (June 2019), https://www.usccr.gov/pubs/2019/06-13-Collateral-Consequences.pdf?eType=EmailBlastContent&eId=d37030a2-bfe6-4784-866a-7db61d64f357.

will affect and impede nearly every sphere of his life when he is released around age 30. Research on "collateral consequences" of sex offenses has highlighted that registrants are effectively punished by the "stigmatization of the public registration process and community members' knowledge of them being on the registry."[5] Registrants "frequently lose their jobs, struggle to find jobs, and when they can find jobs, the jobs are below their qualifications.[6] Underemployment, along with residency restrictions and landlord background checks, contributes to housing instability. A 2023 article discussed the housing challenges faced by sex offenders in Canyon's home state of Oregon.[7] Registrants are also subject to "discrimination, social exclusion, public ridicule, harassment, and violence."[8] For many registrants, the most difficult stigma to bear is the stigma experienced by their family members.[9]

In short, sex offender registration and sex offender conditions of supervised release will affect where Canyon can live, where he can work, with whom he can interact, and where he can spend time, many years from now. He could be restricted from contact with his future nieces and nephews, for example, as well as the children of friends. If he decides to have children of his own, he could be prohibited from dropping them off at daycare or school, or having their friends over—despite the fact

---

[5] Erika Davis Frenzel et al, Understanding Collateral Consequences of Registry Laws: An Examination of the Perceptions of Sex Offender Registrants, 11 Justice Policy Journal 1, 4 (2014).

[6] SOLPRC, Ineffective, Costly, and Harmful: Debunking the Sex Offense Registry, 5 (2025), https://mitchellhamline.edu/sex-offense-litigation-policy/wp-content/uploads/sites/61/2025/03/SORN-Policy-Brief.pdf; see also Frenzel et al., supra note 5 (about 50% of registrants in one study reported losing a job as a result of being a registered sex offender).

[7] Kelsey Turner, Housing restrictions are leaving more Northwest sex offenders homeless, Investigate West (May 3, 2023), https://www.investigatewest.org/housing-restrictions-are-leaving-more-northwest-sex-offenders-homeless/.

[8] SOLPRC, supra note 6 at 5.

[9] Frenzel et al., supra note 5 (in one study, registrants discussed their children and spouses being shunned, ridiculed, and isolated).

that his experienced court-ordered treatment provider has confirmed he does not have any "sexual deviant" interest including in children.

Finally, in assessing just punishment, the Court should also consider Canyon's time on bond, during which he has been subject to strict conditions, including home detention, location monitoring, and no access to the internet, for approximately one year. Although punishment is not the purpose of pretrial release conditions, these conditions have significantly curtailed Canyon's freedoms, including his freedom of movement and freedom of association—at the same time that his conditions have aided him in achieving sobriety, repairing ties with his family, and developing insight. In deciding the length of Canyon's prison sentence, the Court should take into account his pretrial release conditions and their duration in determining whether the proposed sentence would be sufficiently punitive. *See, e.g.*, *United States v. Trujillo-Alvarez*, 900 F. Supp. 2d 1167, 1174–75 (D. Or. 2012) (person subject to conditions of pretrial supervision is "confined" because "they are subject to restraints not shared by the public generally that significantly confine and restrain their freedom"); *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) ("[P]retrial release may be accompanied by burdensome conditions that effect a significant restraint of liberty"); *United States v. Lizardi-Maldonado*, 275 F. Supp. 3d 1284, 1296 (D. Utah 2017) (collecting cases where "courts have found an electronic monitoring condition . . . constitutes a significant restraint on liberty").

As for promoting respect for the law, Canyon has demonstrated respect for the law since his arrest. He has meticulously complied with the conditions of his release and has shown courtesy towards everyone involved in his case, including the Probation Office, law enforcement, the prosecutor, and the Court. He pled guilty in both state and federal court, accepting responsibility for his offenses. As Judge Nagala has written, "While the sentencing objective of promoting respect for the law is often conceived of as a reason to impose a harsher sentence, leniency in sentencing—when

26

appropriate—also promotes respect for the law, as it embraces principles of fairness and justice. Indeed, Section 3553(a) demands that a criminal sentence be sufficient, but not greater than necessary, to serve the purposes of such a sentence." *United States v. Lespier*, No. 3:98-CR-102 (SVN), 2025 WL 213732, at *8 (D. Conn. Jan. 16, 2025).

> 2. *The proposed sentence will deter Canyon and others.*

Canyon has been deterred from any further criminal conduct, as evidenced by his record on pretrial release. Having spent over a year in therapy, he now has a plethora of tools, resources, and skills that he lacked before. His parents and other family members are now aware of Canyon's mental health and substance use issues, and will be much better positioned to support him if his mental health declines in the future. Canyon will also be deterred by the many conditions of supervised release, including internet monitoring and searches by the Probation Office, during his term of supervision. After he completes supervised release, he will continue to be deterred by the extremely harsh penalties associated with repeat sex offenses.

As for general deterrence, there is no evidence that the severity of a sentence—as distinct from the certainty of its imposition—has any significant general deterrent value.[10] *See United States v. Bannister*, 786 F. Supp. 2d 617, 658 (E.D.N.Y. 2011) ("There is little apparent correlation between recidivism and the length of imprisonment."). In fact, social science research demonstrates no difference between the deterrent effects of supervised release as compared to imprisonment.[11] Here,

---

[10] Gary Kleck et al., The Missing Link in General Deterrence Research, 43 CRIMINOLOGY 623 (2005).

[11] Cassia Spohn & David Holleran, The Effect of Imprisonment on Recidivism Rates of Felony Offenders: A Focus on Drug Offenders, 40 CRIMINOL. 329 (2002). *See also* Daniel C. Nagin, Deterrence: Scaring Offenders Straight, in Correctional Theory: Context and Consequences 71 (Francis T. Cullen & Cheryl Lero Johnson, eds. 2012) (noting that "the research does *not* support" proposition that "[o]ffenders sentenced to prison would be less likely to recidivate than offenders put on probation") (emphasis in original); David Weisburd et al., Specific Deterrence in a Sample of Offenders

severe punishment is guaranteed (through the ten-year state sentence) and required (due to the mandatory minimum in the federal case), as well as the collateral consequences discussed above. A sentence longer than ten years is not required to send a message to others that child pornography offenses are and will be punished severely.

>3. *The proposed sentence will protect the public.*

The proposed sentence is also sufficient to safeguard the public. Canyon has shown, through his compliance with his pretrial release conditions, that he does not pose a risk to the public when he is monitored, sober, and receiving appropriate treatment. When Canyon is released to the community, he will be in or around his thirties, subject to strict conditions of supervised release that will further protect the public, and supported by his tight-knit family.

>4. *The Court should consider the need to provide Canyon with treatment in the most effective manner.*

Canyon's rehabilitation began from the moment of his arrest. He has already received and successfully completed significant treatment while on release, including individual and group substance use treatment, mental health treatment, sex offense-specific treatment, and medication management. His time on pretrial release shows that his depression, anxiety, and substance use disorder can all be appropriately managed through treatment, which is readily available in the community.

Incarceration will inhibit, rather than aid, Canyon's rehabilitation. It is unlikely that Canyon will receive regular mental health treatment while in the BOP, given that "[a]s of February [2018],

---

Convicted of White Collar Crimes, 33 CRIMINOL. 587 (1995) (finding that "those sentenced to prison and those not are found to fit similar models of recidivism").

the Bureau of Prisons classified just 3 percent of inmates as having a mental illness enough to require regular treatment." [12] Many BOP facilities include only one or two psychologists, resulting in caseloads of well over 300 inmates per psychologist. Nevertheless, Canyon plans to take advantage of the treatment options available to him while he is incarcerated. In particular, he is interested in the Residential Drug Abuse Program (RDAP), given his history of drug and alcohol abuse, including during the time of his offense. His treatment provider at the Oregon Center for Change has specifically recommended RDAP for Canyon, and the PSR suggests it as well. Exhibit B at 2; PSR ¶ 111(2). RDAP takes about nine months to complete.[13]

There is no treatment purpose to prolonging Canyon's time incarcerated for longer than necessary. Once he begins his term of supervised release, he will almost certainly be ordered by the Probation Office to complete sex offender treatment in the community, and he will also have the opportunity to resume mental health treatment and/or substance use treatment, as appropriate.

### G.  The court should impose a five-year term of supervised release.

Canyon's parents have made clear that Canyon will be welcome to return to live with them upon release, for as long as he needs. His tight-knit, supportive family, who does not lack resources, will do everything in their power to support Canyon as he transitions home from prison. The five-year mandatory minimum term of supervised release, which is also a Guidelines term of supervised release, is sufficient to achieve the purposes of sentencing relevant to supervised release, which

---

[12] *See* Christie Thompson & Taylor Elizabeth Eldridge, *Treatment Denied: The Mental Health Crisis in Federal Prisons,* THE MARSHALL PROJECT (Nov. 21, 2018), http://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons.

[13] https://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp.

include all of the purposes of sentencing aside from punishment. *See* 18 U.S.C. 3583(e). The Court and Probation Office will have five years to ensure that Canyon is connected with treatment, as well as to supervise and monitor his actions, including his internet activity. A supervised release term longer than five years would be greater than necessary.

### H.  The Court should recommend RDAP and FCI Sheridan.

Canyon asks the Court to recommend that the BOP designate him to a prison as close as possible to his family in Oregon, so that he can maintain his family ties through in-person visits. He also asks the Court to recommend the Residential Drug Abuse Treatment Program, as suggested in the PSR, ¶ 111(2),[14] and as recommended by Diana Groener at the Oregon Center for Change. Exhibit B at 2. FCI Sheridan is located in Sheridan, Oregon, about a two-hour drive from the Beasleys' home in Gresham, Oregon. FCI Sheridan offers RDAP.[15] Accordingly, Canyon respectfully requests that the Court recommend a designation to FCI Sheridan and also explicitly recommend RDAP in the judgment.[16]

### CONCLUSION

For the reasons explained above, Canyon Beasley respectfully requests that this Court impose a sentence that is sufficient but not greater than necessary to serve the purposes of sentencing,

---

[14] The PSR lists RDAP locations in the Northeast Region, but Canyon hopes to be designated to the Western Region, as close as possible to his family.

[15] https://www.bop.gov/inmates/custody_and_care/docs/RDAP_Locations_062921.pdf.

[16] The PSR also suggests the BOP's Non-Residential Sex Offender Treatment Program, which the PSR notes is offered at FCI Elkton (in Ohio) and FCI Petersburg (in Virginia). Diana Groener, Canyon's treatment provider at OCC, stressed the importance of his placement near family, recommended RDAP, and noted that sex offender treatment "would be most beneficial when attended while he is in the community, i.e., after incarceration." Exhibit B at 1. Accordingly, Canyon requests that the Court not recommend this program in the judgment, as it could reduce the likelihood that he will be designated to a prison near family and/or a prison that offers RDAP.

30

consistent with the parsimony clause of 18 U.S.C. § 3553. Here, the Guidelines suggest a sentence far greater than necessary to achieve those purposes.

Respectfully Submitted,

THE DEFENDANT,
Canyon Beasley

FEDERAL DEFENDER OFFICE

Date: October 29, 2025

/s/ Carly Levenson
Carly Levenson
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: phv09665
Email: carly_levenson@fd.org

31

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 29, 2025, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Carly Levenson*
Carly Levenson